NATHAN GOLDBERG #61292
Email: ngoldberg@amglaw.com
JOHN S. WEST #102034
Email: jwest@amglaw.com
**ALLRED. MAROKO & GOLDBERG**
6300 Wilshire Boulevard, Suite 1500
Los Angeles. CA 90048
Telephone: (323)-653-6530
Facsimile: (323)-653-1660

TOD F. SCHLEIER, ESQ. #004612
Email: tod@schleierlaw.com
**SCHLEIER LAW OFFICES, PC**
3101 N. Central Avenue, Suite 1090
Phoenix, Arizona 85012
Telephone: (602) 277-0157
Facsimile: (602) 230-9250

Attorneys for <u>Plaintiffs and Proposed Collective Action Members</u>

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMIE SAMANIEGO, PATRICIA BROWN, on behalf of themselves and others similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>MARKEL SERVICE, INCORPORATED, a corporate subsidiary of MARKEL CORPORATION, and DOES 1 through 100, inclusive<br><br>                    Defendants. | 2:20−cv−05061 MWF (AFMx)<br><br>**FIRST AMENDED COMPLAINT (filed pursuant to Stipulation and confirming Order of the Court)**<br><br>**(JURY TRIAL DEMANDED)** |

Plaintiffs Jamie Samaniego and Patricia Brown, in their individual capacities, and on behalf of the Collective Action women defined below, bring this action against the defendants to redress gender discrimination in employment. Plaintiffs allege upon knowledge as to themselves and otherwise upon information and belief as follows:

## NATURE OF ACTION

This is a collective action under the Equal Pay Act of 1963 (hereinafter the "EPA," 29 U.S.C. § 206(d) et seq.) (1) to restrain the unlawful payment of wages to employees of one sex at rates less than the rates paid to employees of the opposite sex who perform comparable work, and (2) to collect back wages due to employees as a result of such unlawful payment practices. The Plaintiffs allege that the defendants discriminated against them, and against a class of similarly situated female employees by engaging in unlawful gender discrimination in compensation as alleged hereinafter.

## JURISDICTION AND PARTIES

1.  Plaintiff Jamie Samaniego (hereinafter "Plaintiff Samaniego") is a female Certified Claims Professional in Claims Litigation Management and a resident of the State of California. She was employed by Defendant Markel Service, Incorporated and the other defendants in various construction defect units until her resignation from the Casualty Claims Organization on or about April 17, 2020. The claims described hereinafter arise out of the plaintiff Samaniego's employment for the defendants at an office established by the defendants in Woodland Hills, California.

2.  Plaintiff Patricia Brown (hereinafter "Plaintiff Brown") is a resident of the State of Arizona.  She was employed by Defendant Markel Service, Incorporated and the other defendants in various units in Scottsdale, Arizona until her resignation from the Casualty Claims Organization on or about January 15, 2020.

3.  Plaintiffs Samaniego and Brown and members of the proposed nationwide EPA Collective Action are "employees" within the meaning of 29 U.S.C. § 203(c).

4.  Defendant Markel Service, Incorporated ("Markel Services Inc.") is a corporation or other form of legal entity that engages in insurance claims adjusting and is an employer subject to the EPA.  Markel Services Inc. is owned and/or controlled by defendant Markel Corporation ("Markel Corp.").

5.  Defendant Markel Corporation is a corporation or other form of legal entity that engages in insurance claims adjusting and is an employer subject to the EPA.  Markel Corp. owns and/or controls defendant Markel Corporation ("Markel Corp.").  Defendant Markel Corp. is a holding company that controls insurance, reinsurance, and investment operations, including employment policies and compensation practices for divisions and/or entities around the world.  Headquartered in Richmond, Virginia and founded in 1930, Markel Corp. reports its ongoing underwriting operations in three segments, and products originate from four insurance divisions and one reinsurance division. For purposes of the EPA, the term "'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee.." 29 U.S.C.A. § 203(d). Markel Corp. was at all times alleged hereinafter an "employer" of the plaintiffs for EPA purposes in that Markel Services Inc. delegated to Markel Corp., or Markel Corp. assumed, responsibility for legal matters and human resources matters pertaining to individuals who nominally worked for Markel Services, Inc. Among other things, Markel Corp. set compensation parameters for Markel Services, Inc. claims personnel, and Markel Corp. reviewed and approved personnel decisions pertaining to individuals who were nominally employed by Markel Services Inc. For example, Markel Corp. imposed a "performance improvement plan" on plaintiff Samaniego under the circumstances alleged hereinafter, Markel Corp. made a determination to deny plaintiff Samaniego a bonus, Markel Corp. addressed human resource complaints voiced by plaintiff Brown regarding her work environment, and Markel Corp. communicated with plaintiff Brown regarding Brown's application for a transfer from a Markel claims office in Arizona to another office located in Georgia. Markel Corp. employed an

individual named Elliot Fitzgerald, who was an in house attorney and who had a Human Resources position, to deal with both named plaintiffs at various times regarding the named plaintiffs' work for Markel Services, Inc.

6.  Markel Services Inc. and Markel Corp. are collectively referred to as "Markel" hereinafter. Markel maintains its headquarters is located in Glen Allen, Virginia and operates claims adjusting offices in various locations in the United States. Markel employed Plaintiff Samaniego at its Woodland Hills, California office and Plaintiff Brown at its Scottsdale, Arizona office.  Defendants Markel Services Inc. and Markel Corp. are each "employers" of the plaintiffs within the meaning of 29 U.S.C. § 203(d), and it has been recognized that two or more employers may jointly employ an individual for the purposes of the Fair Labor Standards Act (FLSA).  *Zhao v. Bebe Stores, Inc.*, C.D.Cal.2003, 247 F.Supp.2d 1154.

7.  The Markel construction defect claims adjusting offices across the country conduct related activities under common control for a common business purpose. Therefore, even though the nationwide EPA Class members work in different locations, they are all employed by a single "establishment" as that term is interpreted under the EPA, by virtue of centralized salary administration, management, and control, the extent of interaction among offices, the functional relationship between the work of the employees in the various locations, and centralized evaluation and setting of compensation among the plaintiffs and proposed collective action members. In particular:

a.  The named  plaintiffs and proposed collective action members are all present or former  Senior Claims Examiners ("SCEs") and/or Executive Claims examiners ("ECEs) employed in Markel's construction defect claims department.

b.  All Markel construction defect SCEs were furnished the same job description and were listed in an organizational chart which made no differentiation among SCEs and ECEs in terms of work performed or responsibilities. The work performed by Markel construction defect SCEs and ECEs

was interchangeable, and that work was, in fact, shifted from office to office depending upon caseload. Work could be and was shifted from office to office because all SCEs and ECEs (1) actively managed a caseload, (2) identified and assessed insurance coverage issues, (3) drafted coverage position letters, (4) retained coverage counsel when indicated, (5) developed and implemented strategies to resolve liability and damage issues in particular cases, (6) investigated claims, (7) reviewed documents (including insured's materials and pleadings) relevant to adjusting particular claims, (8) reviewed litigation materials, (9) retained defense counsel when necessary, (10) directed counsel in accordance with a resolution strategy (litigation management), (11) evaluated coverage, liability and damages in particular claims for purposes of reserves; (12) oversaw expense control measures, (13) traveled to and from locations in the United States to attend mediations and trials and other proceedings and (14) negotiated resolutions of matters.

c.  All Markel construction defect claims offices, and the construction defect SCEs and ECEs employed at those offices, were required to use a Markel "claims dashboard" program to open, close and track pending claims. The dashboard served as a template for all aspects of claims adjusting and was used by all construction defect SCEs and ECEs.

d.  All Markel offices, and the construction defect SCEs and ECEs employed at those offices, were required to follow Markel's written quality performance objectives, Markel's written claims guidelines and various state laws governing fair claims practices. Markel's claims guidelines covered, and standardized, fundamental aspects of claims adjusting and management.

e.  All Markel construction defect SCEs and ECEs were required to undergo training in the same company procedures, policies, and other matters pertaining to claims adjustment. SCEs and ECEs were required to train in Markel procedures contained in approximately seven standardized claims systems and Markel's approach to coverage issues.

f.  The training offered to all Markel construction defect SCEs and ECEs was identical and was available to all of them on Markel's own internal intranet site. That site provided standardized training in the form of recorded seminars and webinars, as well as the law of the various states in which claims arose.

g.  Construction defect SCEs and ECEs at Markel were evaluated under a standardized system of annual reviews which were the basis for compensation decisions. Written performance review instructions provided to all construction defect SCEs and ECEs indicate that all supervisors followed the same performance evaluation procedure, and that compensation and related performance evaluation policies were common across the construction defect SCEs and ECEs. According to those instructions, "every employee and manager must complete a performance  evaluation document." The standard instructions go on to provide that the "ratings and comments for your job responsibilities, performance goals and the Market Competency Model will be used to support a salary and bonus decision…" Markel's standardized review forms address common areas entitled "Job Responsibilities", "Performance Goals", "Competencies", "Summary" and "Overall."  In the section entitled "Job Responsibilities", employees are directed to "Click on the graph icon…to view the job responsibilities for your role." The "competencies" section lists standard criteria labeled "pursuit of excellence." "customer focus," "Business Results," "Collaboration" and "Strong Foundations."

h.  SCEs and ECEs nationwide attended meetings together, received computer generated reports on work tasks/case loads of the various SCEs and ECEs and interacted with each other in writings or conversations on an almost daily basis to discuss work adjusting construction defect claims.

i.  In May of 2019, Markel announced that all construction defect claims examiners, who had previously been administratively divided into East Coast and West Coast regions, would be administratively consolidated into one unit under the overall supervision of Mia Finsess, who was located in Bermuda, Georgia,

effective September 1, 2019. That consolidation did not result in any changes in the job functions of SCEs and ECEs.

j.  When plaintiff Samaniego sought a raise, her supervisor Phyllis Modlin (Manager, West Construction), needed to obtain approval from her own Markel supervisors in Chicago, Mr. Butler and Ms. Melanie Brown. Butler and Brown, working from the Chicago office, came up with conditions, called "special projects," the fulfillment of which would "validate a raise." Plaintiff Samaniego subsequently met with Mr. Butler when he travelled to the Markel Woodland Hills office, and Mr. Butler agreed to discuss a raise when she completed the two "special projects."

k.  One of the "special projects" assigned to plaintiff Samaniego was the creation of claims Prompt Resolution Protocols called "MPR," and she created those protocols. The MPR applied to all Markel construction defect SCEs and ECEs across the country.

l.  When plaintiff Samaniego completed her special assignments, her supervisor Ms. Modlin said that she would forward the work along to Ms. (Melanie) Brown in Chicago pursuant to the original understanding with regard to validating a raise for plaintiff Samaniego. Ms. Modlin also passed Ms. Samaniego's request for a raise on to Nick Conca, Markel's Chief Claims Officer, who worked in Markel's Summit, New Jersey office.

m. When plaintiff Brown was promoted to ECE but did not receive raise, her supervisor Mary Rowe, whose office was in Red Bank, New Jersey, said that she would contact the Markel Human Resources Department to pursue a raise for Ms. Brown. Subsequently, Chris Butler, who worked out of the Markel Chicago office, approved a modest raise for Ms. Brown.

n.  After the East Coast and West Coast sections were administratively combined in May of 2019, Ms. Valarie Jonas became plaintiff Brown's supervisor. Jonas maintained her office in San Francisco, California and oversaw offices in Red

Bank, New Jersey, Richmond, Virginia, Scottsdale, Arizona and Woodland Hills, California.

o.  Plaintiff Brown's supervisor Mary Rowe, who was located in Red Bank New Jersey, discussed a raise for Ms. Brown, who worked in the Scottsdale, Arizona office, with Ms. Rowe's own supervisor at the time, Melissa Hoffman Shartel, who was in the Markel Denver, Colorado office.

p.  Plaintiff Brown applied for a transfer to the Alpharetta, Georgia office of Markel, interviewed with the head of that office, and was told that she was wanted there. Her ECE skills were interchangeable with the skills of construction defect SCEs and ECEs in Markel's Alpharetta office. After Ms. Brown received an offer for the Alpharetta job, Valerie Jonas, who worked out of the Markel San Francisco office, said that she was reconsidering "sending" Ms. Brown to Alpharetta due to complaints by Ms. Brown about working conditions.

8.  The true names, identities or capacities of the defendants sued as DOES 1 through 100, inclusive, are currently unknown to the plaintiffs, who have therefore sued those defendants by such fictitious names. Plaintiffs are informed and believe, and based upon such information and belief allege, that each of the fictitiously named defendants is an individual, corporation, partnership, joint venture, association or other form of legal entity that is legally responsible in some manner for the events and happenings referred to herein, that owned, controlled and/or operated Markel, that engaged in the discrimination alleged hereinafter, and/or that caused the injuries and damages to the plaintiffs as hereinafter alleged. Plaintiffs will seek leave of court to amend this complaint to show the true names, identities and/or capacities of the fictitiously named defendants when same have been ascertained.

9.  Plaintiffs are informed and believe, and based upon such information and belief allege, that in performing the acts and omissions alleged hereinafter, and otherwise at all relevant times, each of the defendants was the agent, servant,

employee, partner, joint venturer and/or co-conspirator of each of the remaining defendants, and acted as within the course and scope of his, her or its authority, employment or conspiracy, or with the ratification, approval, permission and/or consent of the other defendants.

10.  Jurisdiction is conferred upon this Court, and this action is authorized and instituted, pursuant to Sections 16(c) and 17 of the Fair Labor Standards Act of 1938 (the "FLSA"), as amended, 29 U.S.C. §§ 216(c) and 217, to enforce the requirements of the Equal Pay Act of 1963, codified as Section 6(d) of the FLSA, 29 U.S.C. § 206(d).  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, based upon plaintiffs' assertion of federal claims arising under the EPA.

11.  Venue is proper in this judicial district under 28 US.C. § 1391 (b)-(c), because Markel maintains offices in this district, conducts business in this district, and because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this district, and because records relevant to those events and omissions are maintained and administered here.

## FACTUAL BACKGROUND

### A.    Plaintiff Samaniego's Employment at Markel

12.  Plaintiff Samaniego, who has been involved in insurance claims adjusting since 2010, was first employed by Defendants on September 19, 2016 as a Senior Claims Examiner in the Miscellaneous Casualty section of defendants' construction defect claims adjusting department. She then performed that job in the defendants' Professional Liability section. At Markel, she was directly responsible for handling, on a nationwide basis, primary, excess and umbrella construction defect, bodily injury and general liability claims arising from contractors' policies. Among other things, Ms. Samaniego directly managed and oversaw a Third-Party Administrator for a high-volume Florida excess account.  She is proficient in all

1    aspects of claims handling and management, including damage, liability, and

2    coverage issues, reserving, risk transfer, auditing, litigation management and

3    expense control measures. Throughout her employment, plaintiff Samaniego

4    worked in Defendants' Woodland Hills, California office until she resigned from

5    her employment effective April 17, 2020.

6         13.  During her 2018 review, which took place in January of 2019, Ms.

7    Samaniego's then supervisor Phyllis Modlin (Manager, West Construction) told her

8    that she (Ms. Samaniego) was the lowest paid SCE in her unit, and that there was a

9    wide disparity in SCE compensation. Ms. Samaniego was troubled by that

10   information, and resolved to find out whether she was, in fact, underpaid for the work

11   she performed. In February of 2019, Ms. Samaniego handed Ms. Modlin a copy of

12   her paystub. Ms. Modlin confirmed that Ms. Samaniego was the lowest paid of the

13   SCEs and said that there was "room to increase" her salary. Ms. Modlin promised to

14   discuss a raise for Ms. Samaniego with Managing Director Chris Butler and Director

15   of Professional Liability Claims Melanie Brown of Markel's Chicago office.

16        14.  In March of 2019, Ms. Modlin, orally told Ms. Samaniego that according

17   to Butler and Melanie Brown, Ms. Samaniego needed to complete two "special

18   projects" in order to "validate a raise." The "special projects" consisted of (1)

19   creating Prompt Resolution Protocols called "MPR" and (2) selecting, engaging and

20   managing a Third-Party Administrator.

21        15.  During the January to March 2019 time frame, Mr. Butler and Ms. Brown

22   both visited the Woodland Hills office, where Ms. Samaniego was able to meet with

23   them at separate times. When she met with Mr. Butler, Ms. Samaniego told him what

24   Ms. Modlin said about being the lowest paid SCE and about the two "special

25   projects." On one occasion in Woodland Hills, Ms. Samaniego handed Mr.  Butler a

26   printout she had compiled of generic salary data for senior construction defect

27   examiners in California. That compilation indicated that SCEs in California were

28   paid a range of from $85,000 to $110,000 annually. At the conclusion of that

meeting, Mr. Butler agreed to discuss a raise when Ms. Samaniego completed the two "special projects."

16. Ms. Samaniego completed work on the MPR in April of 2019 and delivered it to Ms. Modlin. Ms. Modlin praised the work and said that she would forward it, along with praise, to Ms. (Melanie) Brown. Ms. Modlin also encouraged Ms. Samaniego to finish the second project, so that she could forward it to Mr. Butler.  The second project was finalized by May 29, 2019.

17. On or about March 22, 2019, the Claims and Litigation Management Alliance (CLM) selected Plaintiff Samaniego to receive its "Professional of the Year" award in Orlando, Florida. The Claims and Litigation Management Alliance is a private professional organization that is independent of Markel. Ms. Modlin, attended the CLMA award ceremony and national meeting, where she told Ms. Samaniego that she had passed Ms. Samaniego's request for a raise on to Nick Conca, Markel's Chief Claims Officer. According to Ms. Modlin, Mr. Conca agreed to a "mid-year review" and asked Ms. Modlin not to make any promises to Plaintiff Samaniego because budgets had not been completed.

18. In June 2019, Plaintiff Samaniego asked Ms. Modlin for an update on the review that had been promised upon the completion of the two projects Plaintiff Samaniego had been assigned. Ms. Modlin said to "hang tight."

19. Meanwhile, Markel had announced that East Coast and West Coast construction defect claims examiners would be administratively reorganized to report to one individual, Managing Director Mia Finsess, effective September 1, 2019. Around that time, Ms. Samaniego was told that she would soon be reporting to a new, as yet unnamed, director. Valarie Jonas became Managing Director in approximately September of 2019 and as a result a high-level supervisor over Ms. Samaniego. When Ms. Jonas' visited Markel's Woodland Hills office that month, Ms. Samaniego told Ms. Jonas about her  prior discussions with management regarding being paid less than other SCEs, about the special projects that had been

completed, and about the compensation review that had been promised upon completion of the two special projects. Ms. Jonas did not respond with any information regarding compensation or a raise. Instead, she asked Ms. Samaniego to provide her with all of the documents created for the two special projects. They were sent the same day by email.

20. Around the same time as the conversation with Ms. Jonas, Ms. Samaniego brought Ms. Modlin up to date on her efforts to secure a raise. Ms. Modlin advised Ms. Samaniego not to press for the raise during my upcoming year-end review, explaining that she was in "unchartered waters with Valarie Jonas" and should not "rock the boat" at the time.

21. During the period from September to December of 2019, Ms. Modlin repeatedly told Plaintiff Samaniego she was going to rate Ms. Samaniego a "3" on her year-end review in an effort to increase Ms. Samaniego's pay and bring her "more in line with other examiners." Plaintiff Samaniego believes that the defendants resolved to retaliate against her.

22. Plaintiff Samaniego is informed and believes that in retaliation for the her pursuit of equal pay, she was only rated as a "2" in her 2019 year-end review, and she was subsequently placed on a Performance Improvement Plan, which she disputed. Faced with retaliation and illegal pay practices which the defendants refused to cure or even investigate, Plaintiff Samaniego resigned from her employment on April 15, 2020, which the Defendants made effective on April 17, 2020.

**B.**   **Plaintiff Brown's Employment at Markel**

23. Plaintiff Brown was hired by Markel on August 19, 2013 as a construction defect Senior Claims Examiner at a starting salary of $85,000. She was licensed to practice law and has her adjuster license in Arizona, Louisiana, Texas, Florida, West Virginia, North Carolina, South Carolina and New Hampshire. She had previously been employed by various law firms during the

1990s.  She was then employed as a Senior Claims Examiner and gained extensive experience handling complex construction defect claims nationwide for several insurance companies.  Plaintiff Brown has an extensive background in all phases of insurance company operations including auditing and claims handling procedures and has approximately twenty years' experience handling construction defects claims.

24.  When the defendants hired Plaintiff Brown, they also hired Robert Doukas as a Senior Claims Examiner. Plaintiff and Mr. Doukas were both hired by Plaintiff Brown's then supervisor Mary Rowe to examine and resolve East Coast Construction defect claims, and they were hired to perform substantially equal work.  Plaintiff Brown was told that Mr. Doukas was hired by Markel at a starting salary which was $10,000-$15,000 more than her starting salary at Markel.

25.  In late October or early November 2018, Markel hired Matt Kovacs. Like Plaintiff Brown, Mr. Kovacs has a J.D.  Unlike the plaintiff, Mr. Kovacs did not have any experience handling the duties and responsibilities of a claims examiner despite his having worked for several construction defect firms. Despite that lack of experience, Markel hired Mr. Kovacs as a Senior Claims Examiner, the same title as then held by Plaintiff Brown.  Plaintiff Brown was told that Mr. Kovacs' starting salary was $120,000.  He was part of the construction defect department but handled West Coast construction defect claims.

26.  Due to her excellent performance, as reflected in several years of performance reviews, Plaintiff Brown was promoted effective March 2019 to the position of Executive Claims Examiner and she received a small raise in her salary which did not, however, cause her salary to be equal to her male comparators. Although she was one of the few Markel employees in the construction defect claims unit who held the title of Executive Claims Examiner, her salary at the time she left her employment at Markel in January 2020 was $104,000, well below what Mr. Kovacs was being paid to perform similar work despite his with lesser

qualifications.

27.  In May 2019, Markel announced that the Construction Defect department, including both East Coast and West Coast examiners, would start reporting to Mia Finsess effective September 1, 2019.  Plaintiff Brown learned that from May through September 2019, Ms. Finsess expressed concerns to other Markel executives about the disparity in pay between Plaintiff Brown and similarly situated male employees in the construction defect unit.

28.  During the week of September 2, 2019, Markel announced that Mr. Kovacs had been promoted to Executive Claims Examiner. Around that time, Ms. Brown learned that he had received a significant increase in his salary, and that he was paid well above what she was being paid to perform substantially similar work as an Executive Claims Examiner.  Plaintiff Brown also became aware that Cody Moorse, a Senior Claims Examiner in Plano, Texas who was performing substantially similar work as Plaintiff Brown was paid a salary of $120,000 by Markel, which was significantly more than she was paid for substantially equal work.

29.  Plaintiff Brown was paid less than similarly situated male construction defect examiners who were handling construction defect claims which had a common core of tasks to those performed by Plaintiff Brown.

30.  In light of what she considered to be illegal working conditions, Plaintiff Brown resigned on January 15, 2020, effective January 20, 2020.

**C.    Unequal Pay**

31. Shortly after Ms. Brown's first performance review at Markel, her supervisor Mary Rowe told Ms. Brown that Ms. Brown and another female SCE, Stacy Van Pelt, were the lowest paid SCEs in Ms. Rowe's unit despite carrying higher file loads than anyone else in the unit.

32.  In December of 2018, Ms. Rowe told Ms. Brown that in recognition of the quality of her work, Ms. Brown would be promoted to the position of ECE

effective March 2019 but would not receive a salary raise with the promotion. Then, at some point prior to March, 2019, Ms. Rowe told Ms. Brown that she had learned that a male Markel adjuster who worked in Chicago had received a raise to go with his promotion, and that she (Ms. Rowe) found the denial of a raise to Ms. Brown  upon her promotion to be unfair. Ms. Rowe said that she had contacted the Markel human resources department about Ms. Brown's promotion without a raise.

33.  After Ms. Brown started in her promoted position as an ECE, Ms. Rowe told her that Director Chris Butler had approved a $5,000 raise for Ms. Brown. With that raise, Ms. Brown's ECE salary came to $104,000 per year, which was less than male construction defect ECEs at Markel, and less than male construction defect SCEs employed at Markel.

34.  Shortly after the September, 2019 consolidation of East Coast and West Coast construction defect administrative units, Mary Rowe told Ms. Brown that she had learned of a conversation in which Mia Finsess had expressed concerns (1) that Ms. Brown's salary was so much lower than other ECEs, and (2) that the salary differential had the appearance of gender discrimination.

35.  Mary Rowe, Ms. Brown's former supervisor, also told Ms. Brown:

a.  That she was told to hire a male SCE, Robert Doukas, at a starting salary of between $100,000 and $110,000.00 a year. That salary is higher than Ms. Brown's ECE salary at the time of Ms. Brown's resignation from Markel;

b.  That a male Markel SCE in Plano, Texas named Cody Moorse was paid a salary of $120,000.00 per year. That salary is higher than Ms. Brown's ECE salary at the time of Ms. Brown's resignation from Markel;

c.  That Markel hired a male SCE named Matt Kovacs at a starting salary of $120,000.00. That salary is higher than Ms. Brown's ECE salary at the time of Ms. Brown's resignation from Markel;

36.  Ms. Samaniego's starting salary as a construction defect SCE at Markel was $77,000.00 per year. When she resigned from the company effective

April 17, 2020, her salary was $77,000.00 per year. The male construction defect SCEs named above had SCE salaries at Markel that were far greater than Ms. Samaniego's SCE salary.

37.     Ms. Samaniego was unable to get a significant salary increase despite having successfully completed the two "special projects" that were imposed upon her to "validate" a raise.

38.     Ms. Samaniego on her own initiative compiled of generic salary data for senior construction defect examiners in California. That compilation indicated that SCEs in California were paid a range of from $85,000 to $110,000 annually. She provided that compilation to Managing Director Chris Butler, but was still unable to obtain a meaningful raise.

### D.     Markel's Centralized Decision-Making and Nationwide Policies

39.  Plaintiffs observed that all of Markel's construction defect claims adjusting units use the same standardized personnel and staffing policies.  All construction claims adjusting units use a Markel Claims dashboard which tracks opened, closed and pending claims for each Senior Claims Examiner and Executive Claims Examiner.  All construction claims adjusting units use the same job descriptions and basic Human Resources policies for Senior Claims Examiners and Executive Claims Examiners.  Markel maintains a common internal website, which all of its Claims Examiners can, and do, access for training and other employment-related activities. The administration of compensation policies, practices, and procedures are centralized and are consistent throughout its construction claims adjusting units.

40.  Markel's construction defect claims adjusting units are a highly regimented business operation and adherence to detailed written policies on a wide range of tasks is expected and enforced.

41.  All Senior Claims Examiners and Executive Claims Examiners in Markel's construction defect claims adjusting units should be paid pursuant to the

same common compensation policies and practices without regard for gender.

42.  Where Human Resources complaint and compliance policies due exist at Markel, they lack meaningful quality controls, standards, implementation metrics, and means of redress.  Concerns about gender discrimination such as those expressed to her management by Plaintiff Samaniego are allowed to go unaddressed.

## COLLECTIVE ACTION ALLEGATIONS

43.  Defendants have engaged in systemic gender discrimination in pay against its female employees who are Senior Claims Examiners or Executive Claims Examiners in its construction defect claims adjusting offices. Defendants have caused, contributed to, and perpetuated gender-based pay disparities through common policies, practices, and procedures, including but not limited to common compensation and performance management policies, and centralized decision-making.

44.  Plaintiffs in this action seeks to be appointed as representatives of the Collective Action.

45.  The Collective Action Representatives bring collective claims against the defendants alleging violations of the EPA as a collective action pursuant to 29 U.S.C. § 216(b). The Collective Action Representatives seek to represent all similarly situated female employees of the defendants described above who were paid less than male employees for doing substantially similar work. The systemic gender discrimination by the defendants described in this Complaint has been, and is, continuing in nature.

46.  "Collective Action Class" means women directly employed by the Markel defendants in a Senior Claims Examiner or Executive Claims Examiners Positions in its construction defect claims adjusting units in the United States at any time within three years of filing this Complaint.

47.  Questions of law and fact common to the Collective Action

Representative and the Collective Action Class that the plaintiffs seek to represent include, but are not limited, to the following:

      a. Whether members of Collective Action Class were subjected to an unlawful common policy that resulted in unequal pay for equal or substantially equal work;

      b. Whether Defendants unlawfully failed and continue to fail to compensate members of the Collective Action Class at a level commensurate with similarly situated male employees;

      c. Whether Defendants' policy, practice, or procedure of failing to compensate members of the Collective Action Class at levels commensurate with comparable male employees violates applicable provisions of the EPA; and

      d. Whether Defendants' failure to compensate members of the Collective Action Class at a level commensurate with comparable male employees was willful within the meaning of the EPA.

48. Counts for violation of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b) for all claims asserted by the Collective Action Representatives, because their claims are similar to the claims of the Collective Action Class that they seek to represent.

49. The Collective Action Representatives and the members of the Collective Class that they seek to represent (a) are similarly situated and (b) are subjected to Defendants' common compensation policies, practices, and procedures and centralized decision-making resulting in unequal pay based on sex by failing to compensate members of the Collective Action Class at a level commensurate with male employees who perform substantially equal work and/or hold equivalent levels, job titles, and positions for the defendants.

///

///

///

# FIRST CAUSE OF ACTION

## (Violation of the Equal Pay Act – Unequal Pay Against All Defendants)

50.  Plaintiffs incorporate the allegations of Paragraphs 1-49, inclusive, as if fully set forth herein.

51.  Defendants have discriminated against Plaintiffs and the Collective Action Class in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, *et seq*., as amended by the EPA.  The EPA provides, inter alia, that "[n]o employer ... shall discriminate ... between employees on the basis of sex by paying wages to employees ... at a rate less than the rate at which he pays wages to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions..." Defendants have paid Plaintiffs and the Collective Action Class less than similarly situated male colleagues performing equal or substantially equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions within the same establishment.

52.  The differential in pay between male and female Senior Claims Examiners and Executive Claims Examiners employed by the defendants was not due to seniority, merit, quantity, or quality of production. Although the EPA does not require proof of discriminatory intent, plaintiffs believe that the differential among Senior Claims Examiners and Executive Claims Examiners employed by the defendants was due to gender.

53.  The defendants acted in bad faith after Plaintiff Samaniego repeatedly complained to senior management about unequal pay. The defendants failed to investigate her unequal pay claims and refused to cure the unequal pay working conditions that the Plaintiff Samaniego encountered. By doing so, the defendants caused, attempted to cause, contributed to, or caused the continuation of the wage rate discrimination that is made illegal by the EPA.  Moreover, the above-alleged

pay practices of the defendants, and the defendants' failure to cure those practices, constitute a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a). Because the defendants have willfully violated the EPA, a three-year statute of limitations applies to such violations pursuant to 29 U.S.C. § 255(a).

54.  Due to Defendants' willful violation of the EPA, Plaintiffs and the Collective Action Class are entitled to damages in the amount of the difference between the wages actually received by Plaintiffs and the Collective Action Class and the wages paid to male employees for equal work within the meaning of the Equal Pay Act, together with an additional equal amount as liquidated damages as authorized by Section 16(b) and Section 6(d)(3) of the EPA for three years.

WHEREFORE, the Plaintiffs, individually and on behalf of all others similarly situated requests that the Court Order, and demand that judgment be entered against Defendants as follows:

1.  Plaintiffs request that the Court certify this action as a collective action under the EPA on behalf of Plaintiffs and the Collective and designate Plaintiffs as the Representatives of the Collective Action Class;

2.  Plaintiffs request that the Court order Defendant to file with this Court and furnish to Plaintiffs' counsel a list of the names and addresses of all of Defendant's female Senior Claims Examiners nationwide who currently work or have worked for Defendant as Senior Claims Examiners and Executive Claims Examiners in the construction defect claims adjusting units within the last three (3) years;

3.  Plaintiffs request that the Court authorize Plaintiffs' counsel to issue notice at the earliest possible time to all female Senior Claims Examiners and Executive Claims Examiners nationwide who currently work or have worked as Senior Claims Examiners or Executive Claims Examiners for Defendant in the construction defect claims adjusting units within the last three years, which (a) apprises them of the pendency of this action and (b) permits them to assert timely

EPA claims in this action by filing individual Consent to Join forms pursuant to 29 U.S.C. § 216(b); and to toll the statute of limitations on the claims of all members of the collective from the date the original Complaint was filed until the collective members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt in as Collective Action Plaintiffs;

4.   Plaintiffs pray for the Court to enter a declaratory judgment that the practices complained of here are unlawful and were willful and in violation of 29 U.S.C. § 216(b);

5.   Plaintiffs pray for a judgment awarding Plaintiffs and opt-in class members an amount equal to the difference between the wages actually received and the wages paid to male employees performing equal work;

6.   Plaintiffs pray for a judgment awarding Plaintiffs and opt-in class members liquidated damages;

7.   Plaintiffs pray for a judgment awarding Plaintiffs and opt-in class members pre-judgment and post-judgment interest;

8.  Plaintiffs pray for a judgment awarding Plaintiffs all and opt-in class members attorneys' fees and costs incurred in this action pursuant to 29 U.S.C. § 216(b); and

9.   Plaintiffs and opt-in class members pray for such other and further relief as this Court deems just and proper.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1

## DEMAND FOR JURY TRIAL

2      Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs

3    hereby demand a jury trial.

4

5      DATED this 11 day of August, 2020.

6                                    ALLRED MAROKO & GOLDBERG

7

8                                    By: _____

9                                         JOHN S. WEST
                                         Attorney for Plaintiffs
10

11                                   SCHLEIER LAW OFFICES, P.C.

12

13                                   By: Tod Schleier

14                                       TOD F. SCHLEIER
                                         Attorney for Plaintiffs
15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

# **PROOF OF SERVICE**

## **STATE OF CALIFORNIA COUNTY OF LOS ANGELES**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 6300 Wilshire Boulevard, Suite 1500, Los Angeles, California 90048.

On **August 11, 2020**, I served the within document: **FIRST AMENDED COMPLAINT** on the interested stated below, by the following means of service:

### **SEE ATTACHED SERVICE LIST**

[x]    **By Electronic Transfer to the CM/ECF System:** On this date, I electronically uploaded a true and correct copy in Adobe "pdf" format the above-listed document(s) to the United States District Court's Case Management and Electronic Case Filing (CM/ECF) system. After the electronic filing of a document, service is deemed complete upon receipt of the Notice of Electronic Filing ("NEF") by the registered CM/ECF users.

[]    **By Mail:** As Follows:  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

[]    **By Personal Service:** I caused the above-referenced document(s) to be personally delivered by hand to the person(s) at the address(es) set forth above.

[X]    **(Federal)**    I declare under penalty of perjury that the foregoing is true and correct.

Executed on **August 11, 2020**, at Los Angeles, California.

Jocelyn Gan

1
2

# SERVICE LIST

3

*Jamie Samaniego, Patricia Brown, et al. v.*
*Markel Service, Incorporated, et al.*
**Case No. 2:20−cv−05061 MWF (AFMx)**

4
5
6

## Attorneys for Defendants Markel Services et al.

7
8

Sabrina A. Beldner, Esq.
**MCGUIREWOODS**
1800 Century Park East, 7th Floor
Los Angeles, CA 90067-1501
Telephone: 310.315.8200
Facsimile: 310.315.8210
Email:  sbeldner@mcguirewoods.com

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28